# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,            )  | |
| )  | 8:10CR233 |
| Plaintiff,        )  | |
| )  | |
| vs.                                                )  | FINDINGS AND |
| )  | RECOMMENDATION |
| LEONARD DAN,                                  )  | |
| )  | |
| Defendant.    )  | |

      This matter is before the court on the motion to suppress (Filing No. 19) filed by defendant Leonard Dan (Dan). Dan is charged with possession of a firearm, an Eastern Arms .32 caliber revolver, after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). **See** Filing No. 1 - Indictment. Dan seeks to suppress any evidence obtained from him during his stop by officers inside a restaurant. **See** Filing No. 19. Dan argues the initial detention exceeded the permissible scope of a *Terry* stop and became a de facto arrest without probable cause. *Id.* Dan filed a brief (Filing No. 20) in support of the motion. The government filed a brief (Filing No. 22) in opposition to the motion.

      On August 23, 2010, the court held an evidentiary hearing on Dan's motion. Dan was present with his appointed counsel, Assistant Federal Public Defender Karen M. Shanahan. Assistant United States Attorney Michael D. Wellman represented the United States. During the hearing, the court heard testimony from Omaha Police Department (OPD) Officer David Bruck (Officer Bruck). **See** Filing No. 24. A transcript (TR.) of the hearing was filed on August 31, 2010, whereupon the matter was deemed submitted. **See** Filing No. 27.

## FINDINGS OF FACT

      Officer Bruck is a graduate of the Omaha Police Training Academy and the Grand Island Police Training Academy, and holds a certificate to act as a peace officer in the state of Nebraska (TR. 3-4). Officer Bruck has been employed with the OPD for twelve years and is currently assigned to the day shift in the gang intelligence unit (TR. 3). Prior to his

employment with the OPD, Officer Bruck worked for the Bellevue Police Department for approximately five years (TR. 3-4). For the last two years, Officer Bruck has been assigned to the Greater Omaha Safe Streets Task Force as a liaison between the OPD and the Federal Bureau of Investigation (FBI) (TR. 4). In this capacity, Officer Bruck conducts long-term investigations related to guns, gangs, and drugs (TR. 4).

On April 1, 2010, Officer Bruck was conducting a Project Safe Neighborhoods warrant sweep, which means he had packets containing pictures, information and warrants for certain individuals they were looking for in particular areas (TR. 4, 14). Officer Bruck was in the North Precinct area with another gang unit officer, Officer Chris Duffek, and a uniformed patrol officer, Officer Korth (TR. 4-5). At 6:00 p.m., Officer Bruck was westbound in a marked police cruiser near the intersection of California and 33rd Streets (TR. 4-5). Officer Bruck observed a person in front of J&J grocery store look at the officers and immediately turn to walk into the store (TR. 5, 15-16). Officer Bruck saw the same person watch the officers from inside the front glass windows of the store (TR. 5). The officers turned their vehicle around to go back eastbound (TR. 6). Officer Bruck saw the person walk from the grocery store across the street toward a restaurant, California Taco (TR. 6). When the person, who was still in the crosswalk, saw the officers approach, he changed his pace and "hurriedly" walked into California Taco (TR. 7). The three officers, all wearing police insignia and armed, exited the police cruiser and entered California Taco, a restaurant with a seating area (TR. 7-8, 18-19). Officer Bruck saw the person who the officers followed, later identified as Dan, at the counter appearing to order food (TR. 8-9). The restaurant was not busy and only Dan was at the counter at the time (TR. 18).

Officer Bruck approached and asked Dan his name and date of birth (TR. 9). Dan responded to each question by first saying "huh" then answering (TR. 9, 19). Dan gave his name and date of birth as June 13, 1982 (TR. 9). Officer Bruck asked Dan's age (TR. 9). Dan replied that he was thirty, which was inconsistent with the date of birth given (TR. 9). Believing Dan might be providing false identifying information, Officer Bruck asked him to step outside the restaurant (TR. 9-10, 20). Officer Bruck was concerned Dan might be trying to hide the fact he had a warrant out for his arrest (TR. 10). However, the officers did not have a warrant for Dan's arrest (TR. 14). Officer Bruck testified Dan "complied" with the

request to step outside and Dan was "escorted" outside by the officers (TR. 10, 20).  As Dan complied with the request to step outside, he yelled back into the restaurant that "the police were arresting another nigger" (TR. 10).

Upon exiting the restaurant, Officer Bruck asked Dan if Dan had any weapons (TR. 11).  Dan replied saying, "yes, I have a gun on me," and reached with his right hand toward his waistband (TR. 11).  All three officer reacted by holding onto Dan and placing him in handcuffs (TR. 11-12).  The officers found a loaded firearm inside Dan's waistband on the right-hand side (TR. 11-12).  At that time, Dan told the officers, who had not posed the question, that he "had crack on him, too, so what" (TR. 12).  The officers found approximately 2.6 grams of crack cocaine in Dan's coin pocket on the right side (TR. 12-13).  Dan also carried approximately $650, mostly in twenty-dollar bills (TR. 13).  During transport, and again without questioning from the officers, Dan stated he needed the gun for protection because he was a drug dealer (TR. 13).  Up to this time, the officers had not advised Dan of the *Miranda* warnings (TR. 23).

## LEGAL ANALYSIS

Dan argues the officers lacked any reasonable articulable suspicion to initiate a stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968).  Additionally, Dan contends the stop quickly turned into a custodial arrest without probable cause.  The government argues the officers had legal justification for the initial stop, the reason for which was not dispelled during the course of three background questions.  Further, the government contends Dan voluntarily accompanied the officers outside.  Finally, the government asserts Dan's behavior when he created a disturbance, attempted to reach for the firearm, and admitted having a firearm justified Dan's detention and ultimate arrest.

The government has the burden to prove the initial encounter was voluntary, or that justification otherwise existed for each increasingly intrusive restraint on the defendant.  **See** *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004); *United States v. Escobar*, 389 F.3d 781, 785 (8th Cir. 2004) ("The government bears the burden of showing consent was freely and voluntary given and not a result of duress or coercion, and the burden cannot be discharged by showing mere acquiescence to a claim of lawful authority.").  "Determining

which police-citizen contacts fall within the protections of the Fourth Amendment and which do not is fact intensive and turns on the unique facts of each case." *United States v. Griffith*, 533 F.3d 979, 983 (8th Cir. 2008). When evaluating "each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing" the court "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002) (**citing** *Ornelas v. United States*, 517 U.S. 690, 699 (1996)).

"Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons." *Terry*, 392 U.S. at 19 n.16. A seizure does not occur when a police officer approaches an individual and merely questions him or asks to examine his identification -- so long as the officer does not convey a message that compliance with his request is required. *Bostick*, 501 U.S. at 434; **see also** *United States v. Drayton*, 536 U.S. 194, 200-01 (2002). If "a reasonable person would feel free 'to disregard the police and go about his business,'" the encounter is consensual and no reasonable suspicion is required. *Id*. (**quoting** *California v. Hodari D.,* 499 U.S. 621, 628 (1991)). "It is well established that law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place . . . [and] putting questions to him if the person is willing to listen." *United States v. Green*, 52 F.3d 194, 198 (8th Cir. 1995) (citations omitted). A request for information does not turn consensual questioning into an investigatory stop. *United States v. Pena-Saiz*, 161 F.3d 1175, 1177 (8th Cir. 1998); *United States v. Poitier*, 818 F.2d 679, 682-83 (8th Cir. 1987). Further, as long as a defendant was not selected for an approach for any purely discriminatory reasons, e.g., race or ethnicity, the fact law enforcement chose to approach a particular defendant is without constitutional implication.

One type of encounter between the police and a citizen is an investigative detention, which is a seizure of limited scope and duration within the meaning of the Fourth Amendment and must be supported by a reasonable articulable suspicion of criminal activity. **See, e.g.,** *United States v. Sokolow*, 490 U.S. 1 (1989); *Reid v. Georgia*, 448 U.S. 438 (1980); *Terry*, 392 U.S. at 1; *Griffith*, 533 F.3d at 983-84; *United States v.*

*Saenz*, 474 F.3d 1132, 1136 (8th Cir. 2007). An officer is allowed to stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot. *Saenz*, 474 F.3d at 1136 (**citing** *Terry*, 392 U.S. at 30). "Any detention consequent to an investigative stop must be temporary and must last no longer than necessary." *United States v. Dickson*, 58 F.3d 1258, 1263 (8th Cir. 1995). "In deciding whether a detention lasts too long to be justified in an investigative stop, and therefore becomes an arrest, we consider whether the police 'diligently pursued' a means of investigation likely to resolve their suspicions quickly." *Dickson*, 58 F.3d at 1263 (**quoting** *United States v. Sharpe*, 470 U.S. 675, 686 (1985)). "Generally, the police may take reasonably necessary steps to 'maintain the status quo of a situation while verifying or dispelling suspicion.'" *Dickson*, 58 F.3d at 1263 (**quoting** *United States v. Seelye*, 815 F.2d 48, 50 (8th Cir. 1987)).

The initial questioning of Dan inside the restaurant cannot be considered a custodial interrogation requiring a *Miranda* warning. "[A] request for routine information necessary for basic identification purposes is not interrogation under *Miranda*, even if the information turns out to be incriminating." *United States v. McLaughlin*, 777 F.2d 388, 391 (8th Cir. 1985); **see also** *United States v. Ochoa-Gonzalez*, 598 F.3d 1033 (8th Cir. 2010). The questions Officer Bruck asked Dan were for the purpose of discovering his identity rather than for the purpose of a criminal arrest.

Although the questioning did not require *Miranda* warnings, the three armed officers approached Dan in a restaurant as Dan stood at the counter to place an order. The restaurant was not busy. Dan responded to the questions posed. However, no reasonable person would feel free to disregard the police and go about his business. Dan "complied" with the officer's directive to step outside the restaurant and was "escorted" outside by the officers. Dan's outburst that the officers were "arresting another nigger" belies a voluntary accompaniment of the officers. Therefore, the encounter was not consensual. Similarly, the officers had no reasonable suspicion supported by articulable facts that criminal activity might be afoot. The fact they saw an individual go into a grocery store, look out a window, and hurry across the street when a vehicle was approaching does not provide reasonable suspicion of any criminal activity. This case is easily distinguished from cases where an

5

individual ran away from officers. Furthermore, even considering Dan paused before answering each question posed by Officer Bruck and the inconsistency between Dan's statements regarding his age and date of birth, Dan's conduct does not supply articulable facts that criminal activity might be afoot. Officer Bruck indicates Dan may have been providing false information in order to avoid an arrest warrant. However, Dan's conduct cannot be said to differ from any other member of the community who is confronted by three armed officers. In any event, Dan's conduct did not support the detention occasioned by the officers escorting him out of the restaurant. For these reasons, Dan's motion to suppress should be granted as no reasonable suspicion supported his stop and detention by officers in or while exiting the restaurant. The government has failed to meet its burden of showing the encounter between Dan and the officers, on April 1, 2009, was voluntary, or that justification otherwise existed for Dan's stop or detention. Accordingly, any evidence obtained stemming from the unconstitutional stop and detention should be suppressed. Such evidence includes the firearm, drugs, currency, and statements made by Dan.

Aside from the conduct associated with the initial stop and detention, when Dan responded "yes" to the question about having a firearm and moved as if to retrieve the firearm, the officers were justified in acting to place Dan in handcuffs. **See *United States v. Binion*, 570 F.3d 1034, 1039 (8th Cir. 2009)** (holding a protective frisk is warranted when suspect is potentially armed); *United States v. Walker*, 555 F.3d 716, 721 (8th Cir. 2009) ("Protective searches allow for the use of handcuffs."); *United States v. Robinson*, 119 F.3d 663, 667 (8th Cir. 1997) (noting suspect moving hands toward waist supported reasonable suspicion he had a firearm). Dan's statement about the possession of drugs provided probable cause for his arrest. **See *Binion*, 570 F.3d at 1040**. Absent the initial unconstitutional stop and detention, the officers acted reasonably to handcuff and arrest Dan. Nevertheless,

**IT IS RECOMMENDED TO JUDGE LAURIE SMITH CAMP that:**

Leonard Dan's Motion to Suppress Evidence (Filing No. 19) be granted.

**ADMONITION**

Pursuant to NECrimR 59.2 any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation.  Failure to timely object may constitute a waiver of any such objection.  The brief in support of any objection shall be filed at the time of filing such objection.  Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 8th day of October, 2010.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge